Filed 10/14/22 P. v. Holiday CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CORNELL HOLIDAY,<br><br>        Defendant and Appellant. | A163970<br><br>(Sonoma County Super. Ct. Nos. SCR7180271)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The opinion filed September 20, 2022 is modified as follows:

On page 2, the last sentence of the third paragraph beginning with "The trial court set a further hearing . . . " is deleted.

On page 3, the first sentence of the first paragraph beginning with "As of the hearing . . . " is replaced with "As of a further hearing on August 27, Holiday had still not completed his intake at SAFER."

On page 5, the second sentence of the second full paragraph beginning with "With the $300 intake fee waived . . . " is replaced with "With the $300 intake fee waived and the individual therapy sessions covered through Medi-Cal, Yeoman testified that Holiday's only costs for the program would have been for the group therapy sessions, totaling $100 a month."

1

This order does not effect a change in the judgment.

The petition for rehearing is denied.

Date: October 14, 2022

_____

Richman, Acting P.J.

Filed 9/20/22  P. v. Holiday CA1/2 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CORNELL HOLIDAY,<br><br>        Defendant and Appellant. | A163970<br><br>(Sonoma County Super. Ct.<br>Nos. SCR7180271) |

In 2019, defendant Cornell Holiday was placed on five years' probation and ordered to enroll in and complete the SAFER treatment program for sex offenders.  When Holiday had still not completed the intake process for the SAFER program over a year later, the probation department requested that his probation be revoked. The trial court rejected Holiday's argument that he had failed to enroll in the program because he could not afford its costs, found that he had willfully violated his probation, and later sentenced him to a new two-year term of probation.  Holiday argues that the trial court's finding of a probation violation is not supported by substantial evidence and that the trial court was without jurisdiction to sentence him to a new two-year probation term.  We reject both contentions and we affirm.

1

# BACKGROUND

On July 16, 2019, Holiday pleaded no contest to four counts of first-degree burglary (Pen. Code, § 459)[1], in connection with incidents in which he entered the apartments of residents of the complex where he worked, took items of clothing, and masturbated.

On September 5, the trial court suspended imposition of sentence, placed Holiday on five years' formal probation, and ordered that he "participate in and complete the SAFER program," a three-year sex offender treatment program.[2]

At a hearing on June 9, 2020, defense counsel stated that Holiday would be making just over $1,100 a month once his social security payments started again, and indicated that with respect to SAFER, he "has been trying to participate, but because of his limited assets and finances, he's not able to actually continue to keep paying SAFER. He wants to participate in the program, but he's wondering how he can do that if he's not actually able to pay their fees. He was hoping that there might be an alternative through the probation department, if the probation department can assist him in making those fines and fees or helping him lower the fines and fees and/or helping him pay for the SAFER program." The trial court stated that Holiday's participation in SAFER was a "high priority," and that it had been "told SAFER is supposed to work with people and their finances." The trial court set a further hearing for August 27 at which hearing the parties could present more information about the costs of SAFER and Holiday's income.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] SAFER stands for "The Sex Offenders And Families in Effective Recovery Program."

As of the hearing on August 27, Holiday had still not gone to his assessment at SAFER. The trial court set a further hearing for September 24, and indicated that "[i]f we're still in the same boat, I'm going to set it for a [violation of probation] hearing and we'll go from there."

On September 24, defense counsel stated that "It's my understanding that Mr. Holiday has gone through the intake for SAFER." But the probation officer stated that he had not: "SAFER has told us they don't want to do an intake assessment for him because Mr. Holiday keeps saying that he's not going to be able to afford to go to the program." The trial court indicated it would "just drop this matter and let you work this out or not work it out with Probation." The matter was "dropped due to unresolved SAFER issues," with all terms and conditions of probation to remain in full force and effect.

On October 9, the probation department filed a written request for probation revocation. The request indicated that on September 25, probation had "directed the defendant to participate in treatment at The SAFER Program and finish the intake process," but "[t]he defendant said he could not afford the program; therefore, he will not participate in sex offender treatment." The request concluded: "The defendant has been on formal probation for 13 months; yet he has not started sex offender treatment. Probation has attempted to work with the defendant as he has minimal income, but he appears unwilling or unable to follow through with the Court's orders."

At a hearing on October 15, the trial court summarily revoked Holiday's probation, and set the matter for a formal probation violation hearing.

The formal hearing was ultimately held on April 26, 2021. The first witness was Michelle Yeomans, the Vice President of Operations at the

3

SAFER program. Yeomans testified that the components of the SAFER program include an intake process that consists of paperwork and an interview with the program director, followed by weekly or twice-weekly group therapy sessions, and monthly individual therapy sessions. She also indicated that the average time between a referral from probation and the intake meeting was seven days. She went on to detail Holiday's contact with the program, as follows:

On October 14, 2019, Yeomans received an email from Holiday's probation officer indicating that Holiday was being referred to the SAFER program. Holiday first contacted the SAFER program in March or April of 2020.

Holiday then made and rescheduled two appointments to go through the intake process. Holiday had a third intake appointment scheduled for May 14, but he did not show up. Another appointment was made for May 20, and Holiday again did not show up. By this point, Holiday had been told that SAFER would waive the $300 intake fee.

Holiday had a fifth intake appointment scheduled for June 11 at 8:30 a.m., but he did not show up until noon. Yeomans described that meeting as follows:

"He wanted a letter on our letterhead for courts detailing the cost of the program because he had stated he couldn't afford the program. We did spend about an hour with him trying to make it work. I had, while he was there, made some calls to one of our clinicians who is able to accept Medi-Cal to see if she could take him to do his individual sessions, so that would save him $90.00 a month. I had offered to put him in the one group that does meet every other week for the time being, and that would be $50.00 a group

4

times two times a month, and if he could agree to at least do those groups and pay for those, then I could move forward then with setting him up to finish his paperwork and meet with [program director] Matt, but he had said he couldn't."

Holiday picked up the intake paperwork on July 16.

On August 27, Holiday had another appointment at SAFER, at which Yeomans "[a]gain . . . went over what we could do." With the $300 intake fee waived and the individual therapy sessions covered through Medi-Cal, Holiday's only costs for the program would have been for the group therapy sessions, totaling $100 a month. Holiday never completed the intake process.

On September 25, Holiday's probation officer told him to complete the intake process and enroll in SAFER, but he "said no, he can't afford the program and he's not going to complete the packet."

Holiday was unemployed but was receiving about $1,300 per month in Social Security. Beginning in January 2021, the probation department had a program to pay SAFER's intake fees, as well as $45 of the $50 cost for each of the first ten group therapy sessions, after which probation would "reassess his financial situation with him, basically have him fill out a form again and go over it with him to see if we do need to continue that assistance or if he can pay more."

At the conclusion of the violation hearing, the trial court found:

"[T]his case was next back June 9th of 2020, and that was added to calendar by the defense for a request for a possible modification of probation. That would have been about nine months since sentence was imposed. During that time Mr. Holiday had taken months to contact the SAFER program, he had rescheduled two interviews and not made those interviews, then he had a third appointment of which he was a no-show, no call. He was

5

called by the program rather than making—proactively calling the program. The program then rescheduled with him for May 20th. Again he was a no-show, no call. The Court notes that probation—SAFER made various attempts to work with Mr. Holiday regarding his ability to pay the fees.

"Now, I'm not gonna specifically at this hearing in ruling get into ability to pay because the Court finds that Mr. Holiday did not make effort to sign up with the SAFER program as indicated by the months it took until he contacted the program, his rescheduling program meetings, and then his no-shows and no calls.

"And the Court would also note that his first meeting with SAFER was June 11th where he was late. That was after he'd already put the case on calendar to request a modification. And so in the Court's view, by a preponderance of the evidence, I find that this was a willful attempt not to participate in the SAFER program rather than an issue of ability to pay."

At a further hearing on June 9, defense counsel indicated that Holiday had agreed to "putting sentencing over past September 5th, the expiration of [Holiday's] probation date." The trial court explained "that would mean that potentially, Mr. Holiday, under Penal Code 1203.2 paren e and the case *People v. Leiva*, L-e-i-v-a, the Court would be able to place you on a—new 2-year grant of probation at that sentencing time at which point you'd be able to go forward and complete the program."

Holiday responded "Correct."

At sentencing on October 21, probation indicated that Holiday was "doing well" in the SAFER program, "compliant with that program and reporting as directed and abiding by all the terms." The trial court suspended imposition of sentence and reimposed formal probation for two years pursuant to section 1203.2, subdivision (e), ending on October 21, 2023.

6

Holiday filed a notice of appeal.[3]

## DISCUSSION

### Substantial Evidence Supports the Trial Court's Finding of a Willful Violation

A trial court may revoke probation "if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation or parole officer or otherwise that the person has violated any of the conditions of [his or her probation] . . . ." (§ 1203.2, subd. (a).) "The prosecution must prove the grounds for revocation by a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 447.) We consider 'whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision.' (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 507.) We 'give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. Similarly, all conflicting evidence will be resolved in favor of the decision.' (*People v. Kurey*, at pp. 848–849, fn. omitted.)" (*People v. Buell* (2017) 16 Cal.App.5th 682, 687.)

Substantial evidence supports the trial court's finding that Holiday's violation of the probation condition that he enroll in and complete the SAFER program was willful. Holiday was ordered to enroll in and complete the SAFER program in September 2019. In October, he was referred to the program and asked to complete the intake process, which typically takes place seven days after such a referral. Holiday did not contact the program

---

[3] Because Holiday argues that he should be immediately discharged from probation, we granted his unopposed motion for calendar preference pursuant to California Rules of Court, rule 8.240.

at all for several months. He then rescheduled and did not show up to numerous meetings with the program, and when Holiday's probation was summarily revoked about a year later, he had still not completed the intake process, and was flatly refusing to complete the intake paperwork. This despite numerous meetings and efforts by the SAFER program to lower or eliminate the cost of the program to Holiday, including their willingness to waive the $300 intake fee and to arrange for Medi-Cal to bear the costs of his individual therapy sessions, such that the cost of the program to Holiday would have been $100 a month for his group therapy sessions. And after January 2021, the probation department had a program to cover $45 of the $50 cost for the first ten of those group therapy sessions. All this is substantial evidence in support of the trial court's conclusion that Holiday's failure to enroll in the program was not based on his inability to pay but was instead a willful violation of his probation.

Holiday's arguments to the contrary all fail because they misunderstand the standard of our review. He argues that "the evidence established, at most, a technical and non-willful violation." In particular, he notes that "[t]he trial court did not order [Holiday] to report to the SAFER program within a specific period of time," that it was "not clear whether [Holiday's first two] appointments were rescheduled out of necessity due to the pandemic," that his reasons for not attending his May 14 appointment "are not known," that describing his May 20 appointment as a "no-show" is a "mischaracterization" because he and his attorney were in frequent contact with SAFER "during this time," that his being late to his June 11 appointment was not "willful," and that his tardiness was not the reason he failed to complete the intake process on June 11. Holiday also disputes that he had the ability to pay even $100 a month for the SAFER program. In

8

short, Holiday asks us to consider only certain evidence in the record, and to draw inferences from that evidence in his favor and against the trial court's decision. But in reviewing the trial court's probation revocation decision for substantial evidence, we do the opposite.

**The Trial Court Had Jurisdiction To Extend Holiday's Probation Even After Assembly Bill No. 1950**

Assembly Bill No. 1950 amended section 1203.1 to reduce the maximum term of probation for felonies from five years to two years, with some exceptions not applicable here. (Assem. Bill No. 1950 (2019–2020 Reg. Sess.); Stats. 2020, ch. 328, § 2; § 1203.1.) Assembly Bill No. 1950 took effect on January 1, 2021, while Holiday's probation was in revoked status. Holiday argues that because he was first granted probation on September 5, 2019, his two-year term of probation expired by operation of law on September 5, 2021, and the trial court was without jurisdiction to sentence him to a new two-year term of probation on October 21, 2021.[4] We disagree.

In placing Holiday on a new two-year term of probation, the trial court relied on section 1203.2, subdivision (e), which provides in relevant part: "If an order setting aside the judgment, the revocation of probation, or both is made after the expiration of the probationary period, the court may again place the person on probation for that period and with those terms and conditions as it could have done immediately following conviction." (§ 1203.2, subd. (e).)

In *People v. Leiva* (2013) 56 Cal.4th 498 (*Leiva*), our Supreme Court considered whether, once probation has been summarily revoked, section

---

[4] Because we reject Holiday's argument that the trial court lacked jurisdiction to impose a new term of probation on the merits, we need not reach the Attorney General's argument that Holiday is estopped from making it.

9

1203.2, subdivision (a), which provides that revocation of probation shall "serve to toll" the running of the probationary period,[5] permits a trial court to "find a violation of probation and then reinstate or terminate probation based solely on conduct that occurred *after* the court-imposed period of probation had elapsed," concluding that it did not. (*Leiva*, at p. 502.) The Supreme Court explained that its reading of the statute "gives the defendant, if he prevails at the formal violation hearing, the benefit of the finding that there was no violation of probation during the probationary period." (*Id.* at p. 516.) However, it went on:

"On the other hand, if the prosecution, at the formal violation hearing held after probation normally would have expired, is able to prove that the defendant did violate probation before the expiration of the probationary period, *a new term of probation may be imposed by virtue of section 1203.2, subdivision (e)*, and section 1203.3. This result fairly gives the prosecution, if it prevails at the formal violation hearing, the benefit of the finding that there was a violation of probation during the probationary period." (*Leiva*, at p. 516, emphasis added; see *People v. Jackson* (2005) 134 Cal.App.4th 929, 937 [after expiration of probationary period, "the court should be free to apply [section 1203.2, subdivision (e)] by re-imposing a new term of probation upon appellant for a maximum of five years"].)

In *People v. Medeiros* (1994) 25 Cal.App.4th 1260 (*Medieros*), the trial court twice summarily revoked defendant's probation just before it was to expire for failure to make regular restitution payments. (*Id.* at p. 1262.) After the second summary revocation, the trial court "determined that defendant was not in violation of her probation but reinstated probation and

---

[5] "The revocation, summary or otherwise, shall serve to toll the running of the period of supervision." (§ 1203.2, subd. (a).)

extended it to expire in another five years. As a condition of this second maximum term of probation, defendant was ordered to pay $85 a month." (*Id*. at pp. 1262–1263.) The *Medeiros* court concluded that the trial court's use of section 1203.2, subdivision (e) to extend defendant's probation had been improper, for two reasons: first, the court had expressly determined at the formal revocation hearing that defendant had not violated her probation, and second, section 1203.2, subdivision (a), provides that probation "shall not be revoked" for any nonwillful inability to pay restitution, such that "the necessary predicate for reimposing probation under section 1203.2, subdivision (e), that the court revoke probation and set aside that revocation, is absent." (*Medeiros*, at p. 1266.) However, the *Medeiros* court expressly acknowledged and collected cases holding that section 1203.2, subdivision (e) "authorize[s] reimposing probation beyond the initial maximum term when probation was timely revoked, the initial term expired, and the revocation was set aside." (*Medeiros*, at pp. 1265–1266.) That is precisely what happened here.

The cases relied on by Holiday are inapposite. For example, in *People v. Cookson* (1991) 54 Cal.3d 1091 (*Cookson*), the Supreme Court affirmed the trial court's modification of the terms of defendant's probation on the last day of its term, extending it for two years to allow the defendant to continue making restitution payments to the victim. (*Cookson*, at p. 1094.) The Supreme Court observed, in a footnote, that defendant's probation could not extend beyond the statutory maximum of five years under section 1203.1. (*Cookson*, at p. 1094, fn. 2.) *Cookson* did not involve or discuss section 1203.2, subdivision (e).

In *People v. Freidt* (2013) 222 Cal.App.4th 16 (*Freidt*), the trial court summarily revoked the defendant's probation during the probationary period

11

for failure to pay restitution but never held a formal revocation hearing, leaving the defendant in revoked status for some two-and-a-half years, well beyond the five-year maximum of section 1203.1. (*Freidt*, at p. 22.) When the probationary period had expired, the trial court purported to revoke and extend defendant's probation, all without ever finding a probation violation or holding a formal violation hearing. (*Ibid*.) The *Freidt* court concluded that the trial court had exceeded its jurisdiction, because summary revocation and section 1203.2, subdivision (a)'s tolling provision do not allow trial courts to retain jurisdiction to modify or extend a probationary term indefinitely. (*Freidt*, at pp. 23–24.) But *Freidt* acknowledged that " 'the trial court could not extend defendant's probation beyond five years' . . . unless, under section 1203.2, subdivision (e), 'probation [was] revoked based on a violation of probation and the revocation [was] set aside.' (*Medeiros*, *supra*, at p. 1267.)" (*Ibid*.) Again, that is precisely what happened here.

Similarly, in *People v. Sem* (2014) 229 Cal.App.4th 1176 (*Sem*), the trial court summarily revoked defendant's probation in 2006 based on allegations of failure to pay restitution, and held a 2007 revocation hearing at which it revoked probation but did not sentence defendant to prison or reinstate probation, thus keeping defendant in a "status of perpetual revocation" for the next nine years. (*Id*. at pp. 1185–1186, 1192–1193.) Finally, in 2013, the trial court purported to reinstate probation on the original terms and conditions. (*Ibid*.) The *Sem* court held that the trial court was not authorized to "postpone its disposition" at the 2007 revocation hearing, thereby de facto reinstating probation for a nine-year term, far exceeding the five-year maximum. (*Id*. at p. 1193.) But the *Sem* court expressly acknowledged that at the 2007 formal revocation hearing, "the trial court could have revoked probation and, as an alternative to sentencing defendant

12

to prison, could have reinstated probation 'for that period and with those terms and conditions as it could have done immediately following conviction.' (§ 1203.2, subd. (e).) Because the maximum prison sentence for felony welfare fraud is three years, the court could have reinstated probation for up to five more years, until April 19, 2012. (§ 1203.1, subd. (a).)" (*Id*. at pp. 1191–1192.) Just as the trial court did here.

Finally, we reject Holiday's argument that his term of probation was "wholly arbitrary" and "finds no basis in any statute," such that it violates due process. As discussed, Holiday received a term of probation authorized by section 1203.2, subdivision (e).

## DISPOSITION

The October 21, 2021 order reinstating probation is affirmed.

13

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *


*P. v. Holiday* (A163970)

     \*Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14